UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 16-CV-80501-MARRA

CAROLINA THOMAS,

      Plaintiff,

vs.

TYCO INTERNATIONAL
MANAGEMENT COMPANY, LLC,

      Defendant.

_____/

## ORDER AND OPINION GRANTING MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court upon Defendant's Motion for Final Summary

Judgment [DE 64].  The Court has carefully considered the entire Court file and is

otherwise fully advised in the premises.

Carolina Thomas ("Thomas") has filed a three-count complaint alleging

retaliation and termination in violation of the whistle blower protections of the

Sarbanes-Oxley Act of 2002 ("SOX"), the Dodd-Frank Wall Street Reform and

Consumer Protection Act ("Dodd-Frank Act"), and Florida's Whistleblower Act

("FWA") when she reported what she claims were violations of securities laws.  She

asserts she became a victim of retaliation when, among other things, she reported

that Defendant Tyco International Management Company, LLC ("Tyco") violated the

control provisions of SOX due to workflow deficiencies in the accounting "tie-out"

process, and when she raised concerns regarding a co-worker's credentials.  Tyco

denies there were any workflow deficiencies, asserts that Thomas's claims related to

her co-worker's credentials were patently untrue,[1] and contends Thomas was properly terminated for violating Tyco's Guide to Ethical Conduct.  Thus, Tyco moves for summary judgment on all counts.

## Undisputed Material Facts

Some of the key underlying facts of this case require familiarity with the intricacies of complex financial reporting processes and responsibilities of a large international corporation with over $10 billion in annual revenues.  This challenge is exacerbated by the parties relying on accounting terms to make their arguments throughout their briefs without defining their meaning.  Therefore, the Court conducted its own research to learn the meaning of these terms.  The definitions and source are footnoted.  *See infra* footnote 8, 9.  This challenge is further compounded by the parties' failure to explain the various reporting processes key to this case in terms that a person unfamiliar with accounting and financial management processes would understand.[2]

---

[1]  DE 69-18 at 2 of 16 (Ex. R).

[2]  *See, e.g.,* "Tyco used a tie-out process, which is a reconciliation of the financial analysis with source documents.  First the team extracts the financial data and enters it into a consolidation tool.  At this point the team is being locked out from making any changes to the data.  The second step is the tie-out/reconciliation, which is a control mechanism to verify the completeness of the information." Tyco Statement of Material Facts (DE 65, ¶ 13) citing Albano Depo. at 147.  Thomas responds in her Declaration, "[c]ontrary to Tyco's statement (SOMF 13), the 'lock out' is a fiction, as this data gets additional top side level entries that go into HFM, and the financial reporting team members were responsible for the input and the posting of these entries in HFM.  Defendant's statements that the tie-out process is a reconciliation of the financial analysis with source documents is also inaccurate.  The

**Financial Reporting**

1.   On or about July 1, 2007, Tyco hired Thomas as Manager, Financial Reporting for Tyco's North America businesses.  She had three direct report employees on her team.  Thomas's supervisor was Terri Lippman ("Lippman"), and Lippman's supervisor, was Janine Albano ("Albano").  DE 65, Ex. A, DEF-000384.

2.   Significant to this case, there was a monthly financial closing process, and a separate financial tie-out process.

3.   Albano explains that it "is the Financial Reporting Manager's responsibility to understand and oversee the [monthly reporting] process and ultimately sign-off to provide assurance to the Senior Manager, to me and the Company.  The formal sign-off comes with the completion of the GL[3] to HFM reconciliation.[4] The signed reconciliation is used to evidence the review and approval to auditors, both internal and external."  DE 69-11.

4.   Thomas adds that she was also responsible for the integrity of data in the monthly tie-out, SOX compliance, and was a key contact for external auditors

---

financial tie out is the tie-out of the financial statements reported to the SEC to the trial balances in the general ledger and includes the top side entries that should be posted in both HFM reporting tool and general ledgers."  Thomas Decl. ¶ 5 (DE 69-10); *also* compare DE 65 ¶ 19 with DE 68 ¶ 19.

[3]   Shorthand for "general ledgers."

[4]   Also referred to as "Hyperion Financial Management System" or "Hyperion."

providing assurance that Tyco's financial statements were free of any material errors or weaknesses.  DE 69-10 ¶ 3.

5.  *Monthly financial closing* involved loading financial data from the general ledgers of North America into the Hyperion Financial Management system and reviewing the data.  Thomas Decl. ¶ 4.  The financial closing process involved a review of the financial data by many different people[5] until everyone agreed that the report was representative of the financial results for the period. Albano Depo. at 148 (DE 65-3 at 9-10).

6.  For the *financial tie-out* process, only Thomas's team provided assurance to the auditors regarding the representativeness of the financial results.  Thomas Decl. ¶ 7.  "The monthly financial closing has different (review) promotion levels in HFM, but not the financial tie-out process.  At quarter end when a public corporation typically reports its financial results, the financial tie-out is critical to ensure that the reported financial statements[6] are indeed the financial data that resides in the company's general ledger.  The financial tie-out is included in the external audit performed by Deloitte & Touche[,] Tyco's external auditor."  DE 68 ¶ 12, Thomas Decl. ¶¶ 3-4.

---

[5]  These included various accounting and financial teams, accounting managers, senior managers, as well as Tyco's business partners.

[6]  The data in the financial statements which are reported to Tyco's headquarters are reviewed and consolidated with data from other Tyco businesses, and then reported to the SEC by the Consolidation and External Reporting Teams in Corporate.  DE 72 at 3 citing Thomas Decl. at 2, DE 65-3 at 9.

7.    Around September 2013, the Financial Reporting Team was instructed to start

using/testing[7] SharePoint[8] to facilitate the approval process of the top side

entries[9] in HFM.  DE 65-2.  SharePoint was a shared type of net drive, and

putting the tie-out itself on the SharePoint was new.  Barney Depo. at 86 (DE

69-12 at 25).  The development phase of the SharePoint tie-out process was

used to support the monthly tie-out.  DE 65-2 at 75.  No project team or

project documentation existed for the tie-out workflow project.   DE 65-2 at

76, DEF-000402.

---

[7]  When Thomas and her team used the new system, it was in a "testing environment," which means it did not have the necessary and expected controls or security.  That would only be available if the new system was in the "production environment," which it was not at the time Thomas complained.   Thomas Depo. at 74 (Ex. E).

[8]  Since the parties do not explain SharePoint, the Court found the following description:  Microsoft SharePoint is an enterprise information portal that can be configured to run Intranet, Extranet and Internet sites intended to help improve an organization's effectiveness by streamlining the management of and access to data.  The Microsoft website touts:  "SharePoint empowers teamwork with dynamic and productive team sites for every project team, department, and division.  Share files, data, news, and resources.  Customize your site to streamline your team's work.  Collaborate effortlessly and securely with team members inside and outside your organization . . ."  www.products.office.com; www.aiim.org/What-is-Microsoft-Sharepoint#.

[9]  "A topside journal entry is an adjustment made by a parent company on the accounting sheets of its subsidiaries during the preparation of the consolidated financial statements. They are necessary for accounting as they can be used to allocate income or costs from the larger firm to the subsidiaries. The topside entry is a practice within the scope of the Generally Accepted Accounting Principles, also known as GAAP."  https://smallbusiness.chron.com/topside-entry-accounting-34019.html

8.     "The new system not only changed the review and approval of the tie-out, but also changed the actual process.  Albano replaced HFM and its built-in account mappings and SOX compliance with unsecured job-rolled excel and Monarch applications to perform account mappings and data loading.  This part of the process was unreliable and bypassed the built-in security and data integrity of HRM, which is the Financial Reporting application of Tyco."  DE 69-10, ¶ 6.

9.     John Morales ("Morales"), Senior Reporting Analyst, Financial Reporting, had Site Collection Administrator rights, which enabled him to administer the SharePoint site and allowed him to change the current settings, including the audit trail.  DE 65-2 at 73-74.

10.    On January 23-24, 2014, and on February 7 and 10, 2014, Thomas reported concerns about a proper segregation of duties in the financial reporting team and pointed out that the same person, Morales, should not be able to submit the tie-out and maintain the approval system.  In other words, Senior Analyst Morales had administrative access to the computer and the concomitant ability to manipulate or delete the excel file that reflected tie-out approvals. Thomas believed that this could potentially lead to a situation where "[i]f for some reason a late entry goes in the GL [General Ledger], the excel file could be manipulated to force the tie-out and nobody would ever notice it, perhaps the auditors at a later point."  DE 65, Ex. A, DEF000067–68 (pp 6-7 of 99). Also, in Thomas's opinion, someone above the Director of Financial Reporting,

Albano, should be approving the tie-outs.  On February 7, 2014, she reported

that a workflow was deleted and replaced with a new workflow.  Thomas

believed that these were systemic failures that violated § 404 of the Sarbanes

Oxley Act.[10]  DE 65, Ex. A, DEF000073–74 (pp 8-9 of 99) (e-mail dated 2/7/14);

DEF0000083–84 (pp 10-11 of 99) (e-mail dated 1/24/14); DEF000067-68 (pp 6-7

of 99) (e-mail dated 2/10/14); Thomas Depo. (July 12, 2017) (DE 69-5, Ex. D) at

291:20–291:23.

11.     After an internal investigation into Thomas's complaints, Tyco's own forensic

investigators' noted the lack of security settings and backup, and concluded

that Thomas's supervisor, Lippman, and Lippman's supervisor, Albano, *failed*

*to oversee* the workflow tie-out process, *lacked understanding of the risks*

*involved* in operating finance applications in a development environment as

was being done,[11] and *was not aware of the potential conflicting duties* of

John Morales, Senior Reporting Analyst Financial Reporting, and SharePoint's

---

[10]  This statute requires management and a company's external auditor to
report on the adequacy of the company's internal control on financial reporting.  *See*
15 U.S.C. § 7262(b).  The report must affirm "the responsibility of management for
establishing and maintaining an adequate internal control structure and procedures
for financial reporting" and must also "contain an assessment, as of the end of the
most recent fiscal year of the Company, of the effectiveness of the internal control
structure and procedures of the issuer for financial reporting."  *See* 15 U.S.C. §
7262(a).

[11]  According to Albano "the SharePoint workflow . . . was simply intended to
replace the need to pass paper from one person to the next for approval."  DE 65-3 at
4, 7.

Site Collection Administrator.  DE 65-2 at 73, 76 of 99 (DEF-000402) (emphasis added).

12. According to Thomas, the tie-out process is the main step of the monthly financial closing.  Thomas states she tested the system and noted that the data (*e.g.*, excel spread sheets) could be changed as the files were not password protected.  Thomas maintains that a failed tie-out audit typically translates into material weaknesses in the corporation's financial statements.  Thomas Decl. ¶¶ 3, 4.

13. Thomas does not dispute that auditors check the financial reports after her team performs the tie-outs.  DE 65, Ex. A, DEF000067-68.

14. Tyco mitigated the risks related to the workflow tie-out approval process for the closing of March 2014.  It was agreed that the managers would keep a signed hardcopy of the approval forms and the tie-out file would be maintained on a shared drive.  DE 65, Ex. A, DEF000399-403.

15. The new workflow/tie-out system was canceled in part because of Thomas's complaints regarding her perceived impairment to Tyco's financial controls. DE 69-5 at 54-55, 68, 74, 76, 92.

16. Thomas states the whole reason for her complaints regarding the new workflow/tie-out system was to point out its failure of internal controls, which in turn could affect: (1) audit trail; (2) segregation of duties requirements; (3) integrity of the approval process; and (4) cause a failure on the security of the

tie-out system.  Thomas July 12, 2017 Depo. (DE 69-5, Ex. E) at 54:12-21, 55:1-5, 68:17-24, 74:1-75:9, 76:11-14, 92:20-24.  Further, while the data collected in Boca Raton was not directly submitted to the Securities and Exchange Commission ("SEC"), it was directly transmitted to the Corporate offices in Princeton, New Jersey, where Tyco prepared the consolidated reports for all divisions worldwide.  *Id*. at 298:5-9, 322:20-25.  The Corporate office prepared the consolidated reports, in part, with data directly provided by the Boca Raton office.  *Id*. at 323:5-324:4, 327:11-329:2, 329:14-20, 330:7-12; Barney Depo. (DE 69-12, Ex. L) at 183:19-184:18.

17.    Thomas's emails to investigators Hurst and Foreman do not state that she believed that Tyco had indeed reported incorrect data.  DE 65, Ex. A, DEF000083–84, DEF00073–74, and DEF000067-68.  Thomas believed that because of her reporting that internal controls failed and resulted in unapproved record changes, the company was able to prevent any problems with the audits and that to her knowledge no failed audits occurred.  Thomas Depo. (July 12, 2017) (DE 69-5, Ex. D) at 316:25–318:8.

18.    On April 24, 2014, an internal Forensic Audit Team at Tyco concluded their forensic investigation into Thomas's allegations regarding the tie-out process.  They "noted control weaknesses in the current SharePoint setting and environment."  DE 65-2 at 74, DEF-000400.  Even so, they did not find that any financial statements had been manipulated.  DE 65-2 at 73, DEF-000399.

**Alida Garcia**

19.  Alida Garcia ("Garcia") had been working as an independent contractor

Financial Analyst for Tyco since May 2012.  Garcia Depo. at 76; DE 68, ¶ 6.

20.  In August 2013, a new position was posted that was essentially the same

position that Thomas then held.   DE 68, ¶¶ 2, 7.

21.  Garcia applied online for the position as Manager, Financial Reporting.  DE 65,

¶ 7.

22.  Garcia's application did not list her as being a Certified Public Accountant, but

her resume stated she was so certified since 1989.  DE 69-21 at 4 (Ex. U);

Fonda Depo. at 40.

23.  Tyco relied solely on its recruiter to verify Garcia's credentials.  Fonda Depo.

at 11, 15, 17.  Tyco's vendor conducted a background check based on Garcia's

online application.  DE 65-2, 84-94.  It shows, Education: completed,

discrepancy found; Education: verification cancelled.  *Id.*; DE 69-8.[12]

_____

[12]  Tyco states "[t]he vendor contacted Columbian University ICESI and reported that the institution confirmed that Ms. Garcia graduated from University ICESI with a finance degree.  (Exhibit A, DEF0000525)."  Defendant's Statement of Material Facts, DE 65, ¶ 8.  *This is a complete misstatement* of what the specified exhibit reveals.  The document DEF-000525 shows that the vendor contacted the university, but that it was "unable to verify" *any* information.  DE 65-2 at page 93 of 99 (emphasis added).  While Tyco presents no evidence that a background check on Garcia was ever completed, this fact alone does not implicate a lack of internal controls triggering a reasonably perceived SOX violation.  Garcia had worked for Tyco for 15 months as a contractor before she was hired as Manager, Financial Reporting, giving the company ample time to evaluate Garcia's skills.  Garcia Depo. (DE 65-4) at 76.

24.  Garcia was hired and began employment in her new position on or around
October 10, 2013.  She was introduced to the financial reporting team in an
email from Albano stating that Garcia "holds a B.S. in Accounting from LIBRE
University and a Master's in Finance from ICESI University in Colombia.  She is a
Certified Public Accountant (Colombia)."  DE 65-2 at 64 (DEF-000347).

25.  Garcia, in fact, holds a Columbia "Certifican" (dated August 23, 1990) which
gives her the title "Contador(a) Publico(a)," a Contador Publico degree from
Universidad Libre in Colombia dated March 2, 1990, and a certificate as an
Especialista en Finanzas, with a concentration in Finanzas Avanzadas, from
ICESI in Columbia in 1995.  DE 65-2 at 67 of 99 (DEF-000356), DE 65-2 at 82 of
99 (DEF-000514), DE 65-2 at 83 of 99 (DEF-000515).  Neither party has provided
evidence explaining how Garcia's certificates and degree rate in equivalency
to American certificates and degrees.  Garcia testified that her first degree
took six years, and her second degree, becoming a "specialist in finance with
an emphasis in advanced finance," took 22 months.  Garcia Depo. at 110-112
(DE 65-4).

26.  Thomas maintains that Garcia does not have a B.S. in accounting because "the
B.S. designation doesn't really exist in Colombia.  It's just . . . an accounting
degree.  We don't have anything like that."  Thomas July 12, 2017 Depo. at
177-178.  Thomas also maintains that "Garcia did not possess a master's from
ICESI and she was not a certified public accountant from Colombia."  *Id.* at

179.   Thomas asserts Garcia does not have a master's in finance based on the "paperwork she received from the university."  *Id*. at 180, 183-184.  Thomas states she was concerned that these misrepresentations "could violate the laws because of the responsibility of the person," so she referred the matter to her superiors to investigate.  *Id*. 182, 185-186.

27.   Thomas and Garcia held the same titles and both reported to Senior Manager, Financial Reporting: Terri Lippman.  Thomas and Garcia each had three direct reports at the time that Garcia was hired.  DE 65-2 at 65.

28.   The Financial Reporting Manager position held by Thomas and Garcia did not require a CPA Certification or a Master's degree.  The job description states "Education:  Bachelor's degree in accounting, finance or other business related field.  Masters degree in business administration or CPA Certification Preferred."  DE 65-2 at 59 of 99 (DEF-000339).  Neither Thomas nor Garcia had a CPA certification valid in the United States.  Thomas Depo. at 30-35.

**Internal Investigation and Complaints**

29.   On November 20, 2013, Thomas received the first negative performance review in her career at Tyco.  DE 68 ¶ 50.  Thomas's Performance Evaluation for 2013 rated her as "meets expectations" for results and "at expectations" for behaviors, which Thomas felt was a more negative result than that to which she was entitled.  In her self-evaluation, Thomas rated herself as "exceeds" for results and "at" for behaviors.  DE 65-2 at 35; DE 65, Ex. A, DEF-0000383-384.

30.     On December 4, 2013, Thomas filed an internal Tyco complaint which included

many grievances.  It included the allegation that she "feared back" in August

that Albano, Director of Financial Reporting, "was going to try to take some

sort of retaliation for the fact that I went to HR to inquir[e] about an equity

adjustment . . ." (A salary increase allegedly previously promised by Albano.)

DE 65-2 at 5; DE 65, Ex. A, DEF0000384.  Thomas stated that Albano gave her

"a negative performance review . . . on my behavior" which included

"untruthful statements lacking in support or evidence." *Id.*  Thomas

elaborated,

> [m]y bad behavior according to Janine Albano was probably
> based on the fact that I raised some concerns about my
> team working incredible overtime hours . . .  I requested
> some comp time for the team. . .  The team was concerned
> about the company's policy on working remotely since they
> observed some groups . . . have the opportunity to work
> from home on a regular basis . . .  According to Janine
> Albano none of these questions, issues can be discussed in
> a group meeting or in an open forum.  I also raised a
> concern that some . . . team members brought to my
> attention the fact that the new manager did not have US
> equivalencies for her foreign education and to the fact
> that some of our team members have applied for the
> manager's position and were not called for an interview.

*Id*.

31.     Regarding the purported promised equity adjustment, forensics investigated

the matter and concluded that Albano "in fact submitted for an equity

adjustment, and the documentation supports that contention, but that the

equity adjustment was not approved when the salary benchmarking study was completed and it was determined that Ms. Thomas fell within the appropriate range under her current salary."  DE 69-13, DEF-000385.

32.   Thomas concluded that her performance review conducted by Albano did not result in a downward adjustment to her bonus because she had made an inquiry to HR about not having received an equity adjustment and requested that the inquiry be noted in her file.  *Id.* ; DE 65-2 at 70 of 99, DEF-000384.

33.   Thomas also felt Albano retaliated against her by assigning some of the entities that were under her responsibility to Garcia, by excluding her from meetings making her feel like an outcast, and unfairly accusing her of not doing her job properly.   Thomas Depo. (July 12, 2017) (DE 69-5) at 228-231.

34.   Forensics reported, "[w]ith regard to the assertion by Ms. Thomas that her complaint was not handled with appropriate confidentiality, we do not find the complaint to be well founded.  To be able to conduct the investigation it was necessary to contact Ms. Lippman and Ms. Albano."  DE 69-13, DEF-000386. However, Thomas felt that it was Albano, not the forensic team, who breached confidentiality by commenting about the investigation in front of other Tyco employees.  Thomas Depo. at 229.

35.   On January 23, 2014, Thomas met with internal Tyco investigator's to discuss her concerns regarding her performance review.  During this conversation she brought new issues to the Ombudsman's attention regarding complaints about

Garcia and SharePoint.  DE 65-2, Ex. A, DEF000083-84 (pp 10-11 of 99).

36.     Thomas told investigators Mason Hurst ("Hurst"), Senior Corporate Counsel,

and Jennifer Foreman ("Foreman") that they needed to investigate HR's

failure to do "due diligence" to thoroughly verify Garcia's foreign credentials

and respective titles with the institutions that awarded them.  She was

concerned that they were not commensurate to a U.S. degree, would not

include education regarding GAAP, and that she had misrepresented herself as

a "certified public accountant" in the state of Florida.  DE 68, ¶ 21.  On

February 19, 2014, she sent them a link for an approved foreign credentials

evaluator.  DE 65-2 at 70 of 99 (DEF-000384); Thomas Decl. ¶ 8 (DE 69-10, Ex.

J); Thomas Depo. at 206-207; DE 69-9 (Ex. I) at 11-12 (DEF-000359-360).  She

also "brought up this issue to Lippmann, Albano and Fonda and they said

everything was ok[,] she was a CPA in Colombia."  DE 65-7 at 14 of 19.  In her

Declaration, Thomas avers that she raised the issue about the background

check on Garcia previously in a two-hour interview with Tracie Catalano, the

first ombudsman investigator from HR.  Thomas Decl. ¶ 8 (DE 69-10, Ex. J), *see

also*, DE 65-2 at 69 of 99, DEF-000383.

37.     Thomas wrote in an email, "[a]fter numerous attempts to get Tyco to verify

her foreign credentials[,] when all this failed, we[13] discussed about contacting

---

[13]  Presumably Gael Barney and Erin Lutz, co-workers.

the foreign universities directly about the alleged titles. . .  I made the phone call since it was a foreign country and I speak the language.  [Between February 5 and February 14, 2014,][14] I contacted the universities from my cell phone [to inquire about Garcia's graduate date, type of certification, specialization, and master's degree]. . .[15]  I was asked where I worked and I said Tyco . . . [T]he e-mail confirming what I was told on the phone came to my Tyco e-mail address."  DE 65-7 at 15 of 19, Plaintiff's Bates No. 1428.

38.   On February 26, 2014, Thomas complained in an e-mail to Albano and Lippman that the new organization chart showed that Garcia, who had only been with Tyco for a few months, had been assigned one more direct report than she had, while she had been with the company since 2005 and was a manager since 2007.  She wrote, "[i]s this retaliation for the fact that I engaged in a whistleblower protected activity since I reported the workflow issues to the ombudsman investigators during my case?"  Lippman responded that Thomas's accusation was based on an incorrect assumption, made after seeing an organization chart where the lines between people were missing and in which it seemed like a contractor was reporting to Garcia.  DE 65-2 at 57, DEF-000335.  Thomas did not believe this explanation stating: "the alleged explanation is false, the chart was manipulated after Plaintiff complained."

---

[14]  DE 65-2 at 39 of 99, DEF-000156-161.

[15]  DE 65-2 at 39 of 99, DEF-000156-161.

DE 68, ¶ 25.

39.    The investigators found that "[b]ased on the investigation into [Thomas's]

complaints, we have concluded that management did not act improperly and

acted within its rights and authorities."  DE 65-7 at 9 of 19 (Ex. F).  The

investigation made specific conclusions, including that:

    a.    Thomas's bonus was not adjusted.

    b.    The negative comments in Thomas's performance review were based on feedback obtained from her primary internal customers and were appropriately included in the review.

    c.    Garcia's position does not require a U.S. CPA.

    d.    Garcia obtained a Contador Publica Certificado in Colombia.

    e.    Thomas identified some control weaknesses in the tie-out workflow and Internal Audit is now looking into the issue.

DE 65-2 at 69-72 (DEF-000383-386).

**Thomas's Termination**

40.    On May 7, 2014, Garcia was contacted by the Columbian University ICESI, which

informed her that Thomas had emailed and called them on February 5, 2014

and inquired about Garcia's graduation date, type of certification,

specialization, and master's degree.  DE 65-2, DEF000154-155.  Garcia felt that

Thomas violated Columbian law when she contacted her universities in

Columbia to inquire about her educational credentials.  Garcia immediately

forwarded the e-mail chain, which included evidence of Thomas contacting the

University ICESI from her Tyco e-mail account, to Senior HR Generalist Ozlem

Fonda ("Fonda").  *Id*.

41.     On May 12, 2014, Garcia sent Fonda e-mails that were forwarded to her that

show that Thomas had also contacted the Columbia University Universidad

Libre via telephone and several times via Tyco e-mail between February 5 and

February 14, 2014, to inquire about Garcia's graduation date, student number,

career specialization, and certifications.  DE 65-2, DEF000156-161.

42.     Thomas does not dispute that she contacted the Columbian universities via cell

phone and her Tyco e-mail account, and that when asked where she worked,

she stated Tyco.  It is also undisputed that neither Tyco, nor Garcia,

authorized Thomas to conduct background checks on their behalf.  DE 68, ¶¶

28-30.

43.     Tyco states that there was a business management recommendation (from the

leadership of the controllership, which included Frank McKendry[16]) to

terminate Thomas, which was relayed to the members of the Disciplinary

Subcommittee for North America as follows:

Carolina Thomas contacted two separate Universities in Colombia using
her Tyco e-mail account in an effort to obtain official education records
on her co-worker Alida Garcia.  Carolina used her Tyco e-mail account to
give herself credibility with the universities so that they would release
information to her.  These actions not only invaded Alida's privacy but

---

[16]  Frank McKendry was a member of the finance business leadership and of the
Compliance Committee.  Hurst Depo. at 27.

are a violation of Tyco's ethics.  The recommendation is termination.

DE 65-2 at 81, DEF-000513; Hurst Depo. (Ex. O, DE 69-15) at 22-25; Fonda Depo. (Ex.

P, DE 69-16) at 97.  Based on this summary, the Disciplinary Subcommittee decided to

terminate Thomas.  DE 65-2 at 45, DEF-000162.

44.     According to attorney Hurst, Thomas was terminated for conducting an

        unauthorized background check on her co-worker under false pretenses, which

        violated Tyco's Guide to Ethical Conduct and her co-worker's privacy rights.

        Hurst Depo. at 7-9, 19-20, 27.

45.     Specifically, Tyco's Guide to Ethical Conduct, page 20 § A. Fraud states:

> As Tyco employees, we are expected to be truthful and
> forthright in all interactions and communications.
> Engaging in fraud, which is the act of intentionally
> cheating, tricking, stealing, deceiving, or lying, is
> dishonest and generally criminal.  Intentional acts of fraud
> are subject to strict disciplinary action.

46.     Tyco claims Thomas intentionally tricked or deceived the Colombia university

        officials by falsely claiming or implying that she had been authorized by Tyco

        to verify Garcia's education and credentials.  Then, she supported this false

        assertion by sending e-mail correspondence from her Tyco e-mail account.  At

        the time of Thomas' termination, Tyco's Guide to Ethical Conduct, page 22 §

        D. Data Privacy stated

> We are expected to respect the privacy and protect the
> data of our customers, and employees.  We will collect,
> process, store, and transmit such data lawfully, for proper
> business purposes only, and maintain appropriate

safeguards to prevent unauthorized use or disclosure of the data.

DE 65-2 at 12, DEF 000103-119.

47.    According to Thomas, Frank McKendry told her the reason she was fired was because she accessed the company's employee records, which Thomas denies. Thomas Depo. at 149, 152, 155.  "I accessed the records of a company employee, but I did not access the company's employee records."  Thomas Depo. at 157.

**Thomas's External Complaints**

**A.    Occupational Safety and Health Administration**

48.    On February 26, 2014, Thomas filed a Whistleblower Application with the Occupational Safety and Health Administration ("OSHA") at the U.S. Department of Labor.  DE 65-7.  Thomas asserted that she was denied benefits, harassed, intimated, and other adverse actions were taken when on January 15, 2014 and on or about February 7, 2014, she reported to Tyco

deficiencies in financial files. [Tyco] conducted an internal investigation and closed it with no findings.  [Tyco] assigned a new manager with more accounts and responsibilities than [Thomas]. . .  On November 20, 2013, [Thomas] received a negative performance review . . .  On February 17, 2014, [Tyco] failed to promote [Thomas], assigned a new manager with more accounts and responsibilities than [Thomas], and began to directly oversee [Thomas's] work."

DE 65-10 at 1 (Ex. I).[17]

------

[17]    *See* Thomas Depo. at 113-114 for why some language is deleted.

49.   On June 24, 2015, OSHA dismissed the complaint because over 180 days had
      passed since the Complaint was filed and Thomas had elected to proceed with
      her case in federal court rather that before the Secretary of Labor.  DE 65-2 at
      78, DEF-000452.

**B.    Florida Department of Business Professional Regulation**

50.   On March 3, 2014, Thomas filed an anonymous complaint against Garcia with
      the Florida Department of Business Professional Regulation ("FDBPR") and
      alleged that Garcia was misrepresenting that she has a CPA.  DE 65, ¶ 37; DE
      68, ¶ 37.

51.   On May 16, 2014, the FDBPR found Garcia "is in compliance with Florida
      Statutes" and closed their complaint file.  DE 65-7 at 12.

**C.    SEC and National Labor Relations Board**

52.   On May 15, 2014, one day after her termination, Thomas filed a complaint
      against Tyco with the SEC.  DE 65-7 PL137-142.

53.   On June 23, 2014, August 20, 2014, and November 21, 2014, several months
      after her termination, Thomas filed charges against Tyco with the National
      Labor Relations Board ("NLRB").  DE 65-7, PL303-304.  Some claims were
      voluntarily dismissed.  DE 65-2, DEF000187.

54.   On March 19, 2015, the NLRB approved a settlement of the remaining charge.
      DE 65-2, DEF-000257-264.  Tyco agreed to replace language in its Guide to
      Ethical Conduct, including language concerning a data privacy provision to

protect employees' data and its privacy, and to collect, process, store and

transmit employee data for proper business purposes only, and maintain

appropriate safeguards to prevent unauthorized use or disclosure of such data.

DE 65-2 at 47-51 of 99 (DEF-000257-264).  The settlement agreement states in

pertinent part: "NON-ADMISSIONS - By entering into this Agreement, The

Charged Party does not admit that it has violated the National Labor Relations

Act, as amended."[18]  DE 69-19 at 1.

**Standard of Review**

A party may obtain summary judgment "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  The parties may support their positions by

citation to the record, including *inter alia,* depositions, documents, affidavits, or

declarations.  Fed. R. Civ. P. 56(c).  An issue is genuine if "a reasonable trier of fact

could return judgment for the non-moving party."  *Miccosukee Tribe of Indians of*

*Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).  A fact is material if it "would

affect the outcome of the suit under the governing law."  *Id*. (quoting *Anderson,* 477

U.S. at 247-48).  The Court views the facts in the light most favorable to the

---

[18]  Accordingly, Thomas's response to Defendant's Statement of Material Facts,
is patently false where Thomas states the "NLRB investigation actually found a
violation of NLRA Section 7 rights by prohibiting the sharing of other employee's
information, such as qualifications."  *See*, DE 68 ¶ 41.

non-moving party and draws all reasonable inferences in her favor.  See *Davis v.*

*Williams,* 451 F.3d 759, 763 (11th Cir. 2006); *Howard v. Steris Corp.*, 550 F.App'x 748,

750 (11th Cir. 2013) ("The court must view all evidence most favorably toward the

nonmoving party, and all justifiable inferences are to be drawn in the nonmoving

party's favor.").

     "[T]he court may not weigh conflicting evidence to resolve disputed factual

issues; if a genuine dispute is found, summary judgment must be denied."  *Carlin*

*Commc'n, Inc. v. Southern Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986);

*see also Aurich v. Sanchez*, 2011 WL 5838233, at *1 (S.D. Fla. Nov. 21, 2011) ("If a

reasonable fact finder could draw more than one inference from the facts, and that

inference creates an issue of material fact, then the court must not grant summary

judgment." (citing *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913 (11th Cir.

1993)).  The moving party shoulders the initial burden of showing the absence of a

genuine issue of material fact.  *Shiver v. Chertoff,* 549 F.3d 1342, 1343 (11th Cir.

2008).

     For issues, however, on which the non-movant would bear the burden of proof

at trial,

> the moving party is not required to support its motion with affidavits or
> other similar material *negating* the opponent's claim in order to
> discharge this initial responsibility.  Instead, the moving party simply
> may show [ ]—that is, point[ ] out to the district court—that there is an
> absence of evidence to support the non-moving party's case.
> Alternatively, the moving party may support its motion for summary
> judgment with affirmative evidence demonstrating that the non-moving

party will be unable to prove its case at trial.

*Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115–16 (11th Cir. 1993) ("*Fitzpatrick*")

quoting *U.S. v. Four Parcels of Real Property in Greene and Tuscaloosa Counties in*

*State of Ala.,* 941 F.2d 1428, 1437-38 (11th Cir. 1991) (citations, footnote, and

internal quotation marks omitted; emphasis in original).

> For issues on which the non-movant would bear the burden of proof at trial, the means of rebuttal available to the non-movant vary depending on whether the movant put on evidence affirmatively negating the material fact or instead demonstrated an absence of evidence on the issue.  Where the movant did the former, then the non-movant must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated. Where the movant did the later, the non-movant must respond in one of two ways.  First, he or she may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence.  .   .   . Second, he or she may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.

*Fitzpatrick,* 2 F.3d at 1116-17.

## Discussion

### The Sarbanes-Oxley Act

Section 806 of the Sarbanes-Oxley Act makes it unlawful for a publicly traded

company to "discharge, demote, suspend, threaten, harass, or in any other manner

discriminate against any employee" because the employee engaged in whistleblowing

or other activity protected by the Act.  18 U.S.C. § 1514A(a)(1).  Activity protected by

the Act includes

provid[ing] information, caus[ing] information to be provided, or otherwise assist[ing] in an investigation regarding conduct which the employee reasonably believes constitutes a violation [of criminal statutes involving mail, wire, bank, or securities fraud; a rule or regulation of the SEC (Securities and Exchange Commission); or a provision of law prohibiting fraud against shareholders] ... when the information or assistance is provided to or the investigation is conducted by ... a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct) ...."

*Id.*; *Johnson v. Stein Mart, Inc.*, 440 F.App'x 795, 800-1 (11th Cir. 2011) (citing *Day v. Staples, Inc.*, 555 F.3d 42, 54-5 (1st Cir. 2009)).  To make out a prima facie case for retaliation under SOX, therefore, a plaintiff must show, by a preponderance of the evidence, that "(i) the employee engaged in a protected activity or conduct; (ii) the [employer] knew or suspected, actually or constructively, that the employee engaged in the protected activity; (iii) the employee suffered an unfavorable personnel action;[19] and (iv) the circumstances were sufficient to raise the inference that the

---

[19]  In *Burlington Northern & Santa Fe Railway Co. v. White,* 548 U.S. 53 (2006), the Supreme Court addressed the anti-retaliation provision in Title VII of the 1964 Civil Rights Act, which generally prohibits employers from retaliating against employees who report employment discrimination based on "race, color, religion, sex, or national origin." *See* 42 U.S.C. §§ 2000e-2, 2000e-3. An anti-retaliation claim under Title VII, like an anti-retaliation claim under SOX, requires a showing of an "adverse action" (also referred to as unfavorable personnel action) the employer imposed on the employee.  In *Burlington*, the Court addressed, among other things, "how harmful [the adverse] action must be to constitute retaliation." 548 U.S. at 60. The Court answered that, "the [adverse] action [must be] materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 67-68 (internal quotation marks and citation omitted). "We speak of material adversity because we believe it is important to separate significant from trivial harms." *Id.* at 68. "We refer to reactions of a reasonable employee because we believe that the provision's standard for judging

protected activity was a contributing factor in the unfavorable action." *Johnson v. Stein Mart, Inc.*, 440 F.App'x 795, 800-1 (11th Cir. 2011) (citing 29 C.F.R. § 1980.104(b)(1); *Gale v. U.S. Dept. of Labor*, 384 F. App'x 926, 929 (11th Cir. 2010)).

Once a plaintiff has made a prima facie showing of whistleblower retaliation under SOX, the burden shifts to the employer. *Id.* Unlike other burden-shifting frameworks, the burden on the employer under SOX is a true burden of proof, not mere articulation of a non-retaliatory reason for the personnel action taken. *Id.* (quoting *Welch v. Chao*, 536 F.3d 269, 275 (4th Cir. 2008); citing 18 U.S.C. § 1514A(b)). The employer must rebut the plaintiff's prima facie case "'by demonstrating by clear and convincing evidence that the employer would have taken the same personnel action in the absence of the protected activity.'" *Id.* However, in this case, the burden does not shift because Thomas does not establish a prima

---

harm must be objective." *Id.*

Subsequently, in *Allen v. Admin. Review Bd.*, 514 F.3d 468 (5th Cir. 2008) the Fifth Circuit concluded that the *Burlington* material-adversity standard applied to SOX's anti-retaliation provision as well as Title VII's. 514 F.3d at 476 n.2. Thus, under *Allen*, a SOX anti-retaliation claim requires an unfavorable personnel action that meets *Burlington's* definition of material adversity, *i.e.*, an action harmful enough that it well might have dissuaded a reasonable worker from engaging in statutorily protected whistleblowing. *Halliburton, Inc. v. Administrative Review Bd.*, 771 F.3d 254, 259-60 (5th Cir. 2014). According to *Halliburton*, the defendant's release of the claimant's identity as a whistleblower to the very colleagues about whom he was complaining constituted adverse action under SOX. It was deemed the whistleblower suffered a materially adverse employment action because he was intentionally singled out by his boss with the "imprimatur of differential treatment" and because the employer's "targeted creation of an environment in which the whistleblower is ostracized is not merely a matter of social concern, but is, in effect, a potential deprivation of opportunities for future advancement." *Halliburton*, 771 F.3d at 262.

facie case of whistleblower retaliation (under any of the laws alleged).

**Prima Facie Case**

There is no dispute that Tyco is a publicly traded company, and therefore, it is subject to the provisions of SOX, including the anti-retaliation provision of Section 806.  The ultimate question to be decided is whether Thomas has made out a prima facie case of whistleblower retaliation under SOX.  Of the elements, the parties have not disputed that termination of employment is the type of adverse employment action that can trigger the protections of SOX.[20]  The remaining issues before the court are: (1) whether Thomas engaged in protected activity, (2) whether the decision makers were aware of the protected activity when they made the decision to fire Thomas, and (3) whether the circumstances raise the inference that the protected activity was a contributing factor in the decision to terminate Thomas's employment.  Construing all facts in favor of the nonmovant, as must be done at this juncture of the case, the Court concludes that Thomas has failed to make a prima facie case of retaliation under the SOX, the Dodd-Frank Act or the FWA.

**Protected Activity**

SOX prohibits retaliation against an employee who provides information, causes such information to be provided, or assists in an investigation into conduct that the employee reasonably believes is prohibited by the Act, and where the information or

---

[20]  Thomas alleges many other unfavorable personnel actions were taken against her.  These are discussed *infra* pages 36-42.

assistance is provided to a supervisor or other employee with authority to investigate.

18 U.S.C. § 1514A(a)(1).  The Eleventh Circuit has held "reasonably believes" means

that the plaintiff "actually believed the conduct complained of constituted a

violation of pertinent law" (*i.e.*, had a subjective belief) and that the plaintiff's

belief was objectively reasonable on the facts and circumstances of the case.  *Gale v.*

*Dept. of Labor*, 384 F.App'x 926, 929-30 (11th Cir. 2010) (citing *Welch v. Chao*, 536

F.3d 269, 275 (4th Cir. 2008)), *cert. denied*, 556 U.S. 1181 (2009).  Thomas asserts

that she engaged in protected activity when (1) she asserted a "threat to the

integrity of Tyco's financial management through the employment of Garcia with her

lack of credentials and qualifications," and (2) she complained about deficiencies in

the financial workflow system.  *See, e.g.*, DE 8 ¶ 26.

*Thomas's Objections that Garcia Misrepresented Her Credentials*

Thomas argues Tyco failed to put in place internal controls to prevent the

hiring of Garcia, who willfully misled Tyco regarding her credentials (that she was a

CPA and had a master's degree), and instead placed Garcia in a position of great

responsibility.  Thomas complains that Tyco actually ratified Garcia's conduct by (1)

turning a blind-eye to Garcia's fraud; (2) supporting Garcia before the Florida

Department of Professional Business Regulation; (3) failing to discipline Garcia in any

way; and (4) using Thomas's independent investigation of Garcia's credentials as a

means to terminate Thomas.  Thomas asserts that her reports that Garcia had

misrepresented her professional background was protected conduct because Garcia's

misrepresentations were either illegal, or at the very least, ethical code violations.

Thomas claims she was concerned because Garcia was responsible for reporting over

$4 billion in revenue to Tyco's headquarters and ultimately to the SEC and she was

not qualified for the position.  Thomas contends that she was concerned that Tyco

had failed to verify Garcia's credentials and then, when Thomas reported Garcia's

misrepresentations, her supervisors appeared unconcerned.  Thomas states she

believed that the presence of Garcia in her position posed a threat to the integrity of

Tyco's financial management and a significant risk of loss to shareholders due to her

false credentials and lack of qualifications and that the employment of Garcia

violated the controls provisions in § 404 of SOX.  DE 67 at 2-3, DE 68 ¶¶ 15, 23, 52, 67.

When the Court concluded in its Order Denying Defendant's Motion to Dismiss

that Thomas's complaints regarding Garcia's credentials constituted protected

activity for purposes of her SOX retaliation claim, it was because Thomas was

"challenging Garcia's lack of knowledge, experience, and training in GAAP used in the

United States." DE 26 at 9, n.1.  Thomas alleged that "Garcia was untrained in

generally accepted accounting principles ("GAAP") used in the United States, . . . and

was unqualified to be a financial reporting manager in charge of reporting $4.0 billion

per year to Tyco financial headquarters in Princeton, New Jersey and ultimately to

the SEC." Amended Complaint, DE 8, ¶ 39.  Now, at the summary judgment stage,

Thomas's record is devoid of evidence showing that Garcia was unqualified or

untrained.  Thomas has nothing to support these assertions except her own opinion,

and her own contention that Garcia does not have a Colombian CPA or master's degree.

The record is clear that Garcia holds a Columbian "Certifican" which gives her the title "Contador(a) Publico(a)," a Contador Publico degree from Universidad Libre in Colombia, and a certificate as an Especialista en Finanzas, with a concentration in Finanzas Avanzadas, from ICESI in Columbia. *See supra* ¶ 25. Notably, neither side has submitted evidence from which it can be determined how these Colombian certificates and degree compare to American certificates and degree. There is absolutely no evidence presented that Garcia was unfamiliar with GAAP. While these unsupported allegations were sufficient to survive a motion to dismiss, at this summary judgment stage, the Court concludes that a person in Thomas's position could not have objectively believed that Garcia's "fraudulent misrepresentations concerning her professional background" constituted a violation of federal securities law.

Thomas cannot show that 15 U.S.C. § 78m (b)(2)(B) or any other law requires that employees in a financial reporting department have a master's degree in finance or a CPA. It was not objectively reasonable for Thomas to believe that hiring Garcia for a position that did not require a CPA or a master's degree violated the law, especially when Thomas herself held the same position and did not have a CPA or a master's degree. Thomas has not cited to any case law to support her argument that Tyco violated the law when it hired someone who, in Thomas's opinion only, was

unqualified.  Garcia had worked for Tyco for 15 months as a contractor before she was hired as Manager, Financial Reporting, giving the company ample time to evaluate Garcia's skills.  Garcia Depo. (DE 65-4) at 76.

Thus, Tyco has met its burden of demonstrating the absence of evidence to support Thomas's claim that it violated SOX by hiring Garcia, and Thomas has not made a sufficient showing to withstand a directed verdict on this claim.  Specifically, Thomas has not shown that it was objectively reasonable to believe that hiring Garcia constituted a violation of criminal statutes involving mail, wire, bank, or securities fraud; a rule or regulation of the SEC; or a provision of law prohibiting fraud against shareholders.  Thus, Thomas' complaints regarding Garcia are not protected activity.

_Deficiencies in the Financial Workflow System_

Tyco asserts that Thomas "cannot show that a reasonable person in her position would have believed that the conduct complained of constituted a violation of federal securities law" because her reports involved only purely internal practices. Tyco contends that complaints of purely internal practices do not constitute protected activity under 18 U.S.C. § 1514A(a)(1),[21] and that Thomas cannot show that an actual violation of securities laws occurred.[22]  DE 64 at 2.  Tyco made these same

---

[21]  Civil Action to Protect Against Retaliation in Fraud Cases.

[22]  In order to engage in protected conduct under SOX, a plaintiff does not need to prove that she reported an actual violation, but that she reported what she reasonably believed to be a legal violation.  _See Sylvester v. Parexel Int'l LLC_, No. 07-123, 2011 WL 2517148, at *14 (U.S. Dept. of Labor, May 25, 2011).  The same is true under the Dodd-Frank Act, 17 C.F.R. § 240.21F-2(b)(1)(I) ("reasonable belief");

arguments in its Motion to Dismiss, which the Court previously rejected:

> After a careful review of the Amended Complaint, the Court concludes that the allegations sufficiently state a SOX retaliation claim based upon the inadequate tie-out process.  As to Defendant's argument that Plaintiff's complaint relates only to breaches of internal policy, the allegations of the Amended Complaint show that Plaintiff complained about the lack of data security, the lack of an appropriate approval process, and the lack of segregation of duties in the process used to verify the accuracy of consolidated financial information.  Data security, approvals, and segregation of duties are controls that exist to ensure the accuracy of financial reporting.  *See Commission Guidance Regarding Management's Report on Internal Control Over Financial Reporting Under Section 13(a) or 15(d) of the Securities Exchange Act of 1934*, Release Nos. 33–8810; 34–55929 ; FR–77; File No. S7–24–06, 72 Fed. Reg. 35,343 n.27 (June 27, 2007) ("Controls have unique characteristics, for example, they can be: Automated or manual; reconciliations; segregation of duties; review and approval authorizations; safeguarding and accountability of assets; preventing or detecting error or fraud."). *An employee's complaint concerning inadequate internal control over financial reporting can constitute protected activity. Wiggins v. ING U.S., Inc.,* No. 3:14-CV-01089 (JCH), 2015 WL 8779559, at *7 (D. Conn. Dec. 15, 2015) (holding that complaint adequately alleged that plaintiff reasonably believed that her employer had violated SOX § 404, requiring it to establish adequate internal controls, when she raised concerns regarding inaccuracies in her employer's market value assessments).

*Thomas v. Tyco Int'l Mgmt. Co., LLC,* 262 F. Supp. 3d 1328, 1336-37 (S.D. Fla. 2017)

(emphasis added).

---

*Thomas v. Tyco Int'l Mgmt. Co., LLC,* 262 F. Supp. 3d 1328, 1337 (S.D. Fla. 2017). There is no requirement that an employee wait until misconduct occurs to engage in protected activity, just that the employee reasonably believes that the violation is likely to happen.  *Sylvester*, 2011 WL 2517148, at *14; *see also, Wiest v. Lynch*, 710 F.3d 121, 133 (3rd Cir. 2013) (noting that it "would frustrate the [purpose of the Act] to require an employee, who knows that a violation is imminent, to wait for the actual violation to occur when an earlier report possibly could have prevented it").

The reasonable belief standard encompasses both subjective and objective prongs.  The subjective component is based on Thomas's belief, in light of her education and experience, while the objective portion is analyzed against the reasonable person standard.  *Sylvester*, 2011 WL at 14-15.  The objective component of the "reasonable belief" test is evaluated "based on the knowledge available to a reasonable person in the same factual circumstance with the same level of training and experience as the aggrieved employee." *Id*. at 15.  "Often the issue of 'objective reasonableness' involves factual issues and cannot be decided in the absence of an adjudicatory hearing." *Id.*, citing *Allen v. Admin. Review Bd*., 514 F.3d 468, 478 (5th Cir. 2008).

Thomas asserts she subjectively believed that she was reporting violations of internal controls which could result in material misstatements in SEC filings based upon Tyco's use of a deficient tie-out process.  DE 68, ¶¶ 12-14, 19.  She conducted testing that showed her that the new process and file system were deficient.  Thomas Depo. at 74-75.  Thomas believed that the deficient tie-out process could affect: (1) audit trail; (2) segregation of duties requirements; (3) integrity of the approval process; and (4) cause a failure on the security of the tie-out system. *See, e.g.*, Thomas Decl. ¶¶ 3-7; DE 68 ¶¶ 59-61.

The Court concludes that a genuine issue of material fact exists as to whether Thomas reasonably believed that she was engaging in protected conduct each time she raised issues regarding Tyco's lack of internal controls regarding financial

management because the deficiencies could have violated § 404 of SOX (15 U.S.C. § 7262).

**Were the decision makers aware that Thomas had reported internal control failures when they made the decision to fire her?**

Tyco states that there was a business management recommendation (from the leadership of the controllership, which included Frank McKendry) to terminate Thomas, which was relayed to the members of the disciplinary subcommittee for North America as follows:

> Carolina Thomas contacted two separate Universities in Colombia using her Tyco e-mail account in an effort to obtain official education records on her co-worker Alida Garcia.  Carolina used her Tyco e-mail account to give herself credibility with the universities so that they would release information to her.  These actions not only invaded Alida's privacy but are a violation of Tyco's ethics.  The recommendation is termination.

DE 65-2 at 81, DEF-000513; Hurst Depo. at 22-25; Fonda Depo. at 97.  It is asserted that based on this summary, the Subcommittee decided to terminate Thomas.  DE 65-2 at 45, DEF-000162.

According to Hurst, Thomas was terminated for conducting an unauthorized background check on her co-worker under false pretenses, which violated Tyco's Guide to Ethical Conduct and her co-worker's privacy rights.  Hurst Depo. at 7-9, 19, 27.  Tyco claims Thomas intentionally tricked or deceived the Colombia university officials by falsely claiming or implying that she had been authorized by Tyco to verify Garcia's education and credentials.  Then, she supported this false assertion by

sending e-mail correspondence from her Tyco e-mail account.[23]

Tyco claims that neither the "business" unit that recommended termination nor the disciplinary subcommittee who voted on her firing was provided any information regarding Thomas's internal and external complaints. The basis of this claim is the testimony of Fonda and Hurst. Although Fonda and Hurst may be characterized as self-interested employees, the Court may rely on their testimony to demonstrate that no genuine issue of material fact exists because Thomas has not presented any evidence to refute their testimony or impeach their credibility.

Thomas argues that the following language in *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) (quoting 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure at 300 (2d ed.1995)), precludes the district court from considering Fonda's and Hurst's testimony in deciding a motion for summary judgment, and thus leaves Tyco with no evidence denying retaliation: "[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'"[24]

---

[23] *See, supra* ¶¶ 42, 44, 46.

[24] Although *Reeves* concerned whether, under Fed. R. Civ. P. 50, sufficient evidence existed to support a jury verdict in an age-discrimination case, the unanimous Court stated that "the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'" *Reeves*, 530 U.S. at 150 (citations omitted). Thus, *Reeves*' analysis is relevant here.

Thomas misinterprets the import of this language to mean that courts may never consider testimony or affidavits of interested persons as a basis for granting summary judgment.  Since most evidence submitted in support of motions for summary judgment comes from interested parties, if Thomas's contention was correct, then all cases would be required to go to trial.

Courts may consider uncontradicted testimony from a defendant company's employee at summary judgment.  *Bettis v. Toys R Us*, 646 F. Supp. 2d 1273, 1295 (S.D. Fla. 2009) (there was no error committed in relying on the testimony of interested witnesses ([SunTrust's] employees) in granting summary judgment).  The interpretation of *Reeves* advocated by Thomas "leads to absurd consequences" because defendants will often be able to respond only through the testimony of their employees.  *Almond v. ABB Indus. Sys., Inc.*, 56 F.App'x 672, 675 (6th Cir. 2003) (per curiam).  To support its conclusion, the *Almond* court cited additional language from Federal Practice and Procedure:  "The testimony of an employee of [the movant] must be taken as true when it disclosed no lack of candor, the witness was not impeached, his credibility was not questioned, and the accuracy of his testimony was not controverted by evidence ...."  Wright & Miller at 287 n.9.  *Almond's* holding is consistent with *Chesapeake & Ohio Ry. v. Martin*, 283 U.S. 209, 218 (1931), in which the Supreme Court stated that courts need not deny the conclusiveness of testimony of the moving party that "is not contradicted by direct evidence, nor by any legitimate inferences from the evidence[,]" because the rule requiring that testimony

be considered by the jury is not "an absolute and inflexible one."

*Almond* and *Chesapeake* establish that the issue, therefore, is not whether this Court may consider the testimony of Fonda and Hurst, but instead whether their testimony is uncontradicted.  Not only is their testimony uncontradicted, it is corroborated by other evidence.  *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 272 (3d Cir. 2007); *Stratienko v. Cordis Corp.*, 429 F.3d 592, 597-98 (6th Cir. 2005); *Traylor v. Brown*, 295 F.3d 783, 791 (7th Cir. 2002) (explaining that the court should consider uncontradicted testimony from a defendant company's employee at summary judgment); *Cf. Hibiscus Assocs. Ltd. v. Bd. of Trustees of Policemen & Firemen Ret. Sys. of City of Detroit*, 50 F.3d 908, 921 (11th Cir. 1995).  Namely, Thomas admits that she reached out to the Colombian universities and that such actions violated Tyco's Code of Ethics as they stood at the time.

There is no evidence in the record on which a reasonable jury could find that the relevant decision makers were aware of Thomas's protected conduct when they made the decision to fire her.  For this reason, Thomas has failed to make out a prima facie case of whistleblower retaliation under SOX.

**Do the circumstances raise the inference that Thomas's report of internal control failures was a contributing factor in the decision to terminate her?[25]**

Since the Court concludes above that the decision makers were *unaware* that Thomas had engaged in protected conduct, reason dictates that Thomas's reporting could not have been a contributing factor in the decision to terminate her.  However, even if the decision makers knew about her report of internal control failures, the length of time between Thomas's protected activity and her termination defeats any plausible argument that her protected activity could have been a contributing factor in her termination.

Thomas's first reported complaint that alerted Tyco to the unreliability of the new monthly tie-out process was on or before January 23, 2014.  *See* ¶ 35.  Thomas was not terminated until nine days short of four months later on May 14, 2014.  The Eleventh Circuit Court of Appeals has stated that where "there is no other evidence tending to show causation, the temporal proximity must be 'very close.'"  *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)) (concluding a gap of three to four months is not close enough); *Singleton v. Public Health Trust of Miami-Dade County*, 725

---

[25]  To maintain an anti-retaliation claim under SOX, a Plaintiff must also show that her protected activity was a "contributing factor" in the unfavorable personnel action.  *Johnson v. Stein Mart, Inc.*, 440 F.App'x 795, 800-01 (11th Cir. 2011) (citing 29 C.F.R. § 1980.104(b)(1)); *Gale v. U.S. Dept. of Labor*, 384 F.App'x 926, 929 (11th Cir. 2010); 18 U.S.C. § 1514A(b)(2)(C); 49 U.S.C. § 42121(b)(2)(B)(I); 29 C.F.R. § 1980.109(a).

F.App'x 736, 738 (11th Cir. 2018) (plaintiff failed to establish that the decision-maker had knowledge of protected activity, and failed to establish the decision-maker's knowledge was acquired in close temporal proximity to the adverse action); *Chunxue Wang v. Fla. Atlantic Univ. Bd. of Trustees*, 16-CIV-80915-MARRA, 2018 WL 3241359, at *14 (S.D. Fla. 2018); *Higdon v. Jackson*, 393 F.3d 1211, 1221 (11th Cir. 2004) (finding three month period did not create link between protected activity and alleged retaliation); *Wascura v. City of S. Miami*, 257 F.3d 1238, 1248 (11th Cir. 2001) (holding three and one-half months not enough to show causation).  In the absence of other evidence tending to show causation, when there is a three or four month delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law.  *Thomas*, 506 F.3d at 1364.

But Thomas asserts that soon after her first complaint in January, many unfavorable personnel actions other than termination were taken against her.  She devotes the following paragraph in her response to the Motion for Summary Judgment to make the argument that her protected reporting was a contributing factor to various unfavorable personnel actions:

> Plaintiff first spoke out about Garcia's fraudulent credentials on September 26, 2013 and within two months suffered the adverse performance review.  She then filed her complaint with the Ombudsman on December 2, 2013, and almost immediately was accused of performance problems, excluded from meetings and treated as an outcast.  Plaintiff brought her workflow complaints to the Ombudsman's attention in January 2014 and in early February, learned that her alleged counter-part was provided additional reports and was given some of Plaintiff's account responsibilities.  Plaintiff filed her OSHA and

> DBPR complaints in early March 2014.  Approximately six weeks later, the forensic accounting investigation substantiated her complaints regarding the workflow and tie-outs.  Two weeks after that, on May 2, 2014, the CEO was alerted as to Garcia's fraudulent credentials.  And, less than two weeks later, Defendant fired Plaintiff on May 14, 2014 – though it was logged into the system on April 30, 2014.

DE 67 at 11-12.

This argument conflates two separate issues and claims -- Thomas's reporting Garcia's purported "fraudulent" credentials (which act does not constitute legally protected activity) and Thomas's reporting weaknesses in the workflow/tie out (which was protected activity).  Thomas's reporting weaknesses in the workflow tie-out process was first made on or about January 24, 2014.  *See* DE 68, ¶ 62.  The purported negative performance review was received by Thomas two months earlier on November 20, 2013.  Many other alleged unfavorable personnel actions, such as being improperly accused of performance problems, being excluded from meetings and treated as an outcast occurred "almost immediately" after December 2, 2013.  By the sequence of these events, it was not possible for these acts and events to have been made in retaliation for her protected reporting of workflow/tie out deficiences because that conduct had not yet occurred.  Even Thomas acknowledged in her deposition that retaliation can only occur when protected activity precedes retaliation.  Thomas Depo. at 121.  In this case, the protected activity occurred *after* the purported low performance review, *after* she alleges she was subjected to baseless scrutiny and false criticisms of her work, and *after* she says she was excluded

from meetings.  Accordingly, as a matter of law, Thomas's only protected activity, the reporting of deficiences in the workflow/tie out, could not be a "contributing factor" to these alleged unfavorable personnel actions.

Two alleged unfavorable personnel actions from the argument quoted above can be said to have occurred *after* Thomas engaged in protected activity:  Garcia was given some of Thomas's account responsibilities, and Garcia was assigned one more subordinate than she had.  Thomas Depo. at 231:12-16, 232:1-234:8; Barney Depo. at 147-148.

First, the record does not support the allegation that Garcia was assigned one more subordinate than Thomas.  Regardless, even if true, this fact, as a matter of law, does not qualify as an unfavorable personnel action against Thomas.  It may have been a favorable personnel action for Garcia, but it had nothing to do with Thomas, did not effect her position, and a reasonable employee would not have found this to be materially adverse to her.  *See Burlington Northern,* 548 U.S. at 68; *see also Stavropoulos v. Firestone,* 361 F.3d 610, 617 (11th Cir. 2004).

The remaining possible unfavorable personnel action was that some of Thomas's account responsibilities were given to Garcia.  For evidence that "Albano assigned some of Plaintiff's responsibilities concerning entities she managed to Garcia," Thomas cites her deposition at pages 228-229.  DE 68, ¶ 51.  There is nothing relevant on page 228, and all she says on this issue on page 229 is: "She assigned some of the entities that were under my responsibility to Alida Garcia."  Thomas

Depo. at 229:2-3.  Thomas repeats the allegation without further detail on pages 231:12-16 and 232:1-6.  This assertion is ambiguous and Thomas does not provide any further argument or record evidence to overcome Tyco's summary judgment motion.

The Court is mindful that the "adverse action" test applied to retaliation claims is distinct from that applied to disparate treatment claims.  Tyco's principal brief does not recognize this distinction, but instead urges application of the stricter disparate treatment iteration to all of Thomas's claims.  *See*, DE 64 at 10.  Such an approach would be improper and contrary to binding precedent.  *See Crawford v. Carroll*, 529 F.3d 961, 973-74 & n.14 (11th Cir. 2008) (explaining that under new test for adverse action in retaliation context, "the type of employer conduct considered actionable has been broadened," the new standard for adverse action in retaliation cases is "decidedly more relaxed" and "accords an employee protection from a wider range of retaliatory conduct," and "while the new standard ... applies to Title VII retaliation claims, it has no application to substantive Title VII discrimination claims").  It is therefore instructive to delineate separately the proper tests for this element of a discrimination prima facie case and the retaliation prima facie case.

In the Title VII discrimination context, "[n]ot all employer actions that negatively impact an employee qualify as adverse employment actions."  *Howard v. Walgreen Co.*, 605 F.3d 1239, 1245 (11th Cir. 2010) (citation and internal quotation marks omitted).  Rather, "only those employment actions that result in a serious and material change in the terms, conditions, or privileges of employment will suffice....

[T]he employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id.* (citations and internal quotation marks omitted).

By contrast, as stated earlier, the test for an adverse employment action in retaliation cases is whether the employer's conduct "might deter a reasonable employee from pursuing a pending charge of discrimination or making a new one." *Crawford*, 529 F.3d at 974. Thus, in the retaliation context, a "materially adverse action" is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (citation omitted).

In this regard, the Eleventh Circuit has read applicable Supreme Court precedent as "strongly suggest[ing] that it is for a jury to decide whether anything more than the most petty and trivial actions against an employee should be considered 'materially adverse' to him and thus constitute adverse employment actions." *Id.* at 973 n.13. In addition, "the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Burlington Northern*, 548 U.S. at 69. In determining whether the requisite level of adversity is reached, it is necessary to examine the alleged adverse actions in the aggregate. *See, e.g., Akins v. Fulton County, Ga.*, 420 F.3d 1293, 1301 (11th Cir. 2005) ("In deciding whether employment actions are adverse, we consider the employer's acts both individually and collectively.")

Having carefully considered all the alleged adverse actions, we are left with only one alleged unfavorable employment action,[26] which is summarily asserted and unsupported by any specific evidence.  Even if a reasonable fact finder could determine that having some of one's account responsibilities assigned to another employee might have dissuaded a reasonable worker from engaging in statutorily protected activity, Thomas has not produced sufficient evidence to demonstrate that this actually occurred.  She provides no specifics on who decided to assign some of her accounts to Garcia, whether this person was aware of her reporting, or how this reassignment impacted her job.  The Eleventh Circuit "has consistently held that conclusory allegations without specific supporting facts have no probative value." *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000) citing *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985).  Thomas has the burden of proving that she suffered an unfavorable personnel action; in response to Tyco's motion for summary judgment, she has not provided any "specific facts" supporting her claim that some of her accounts were assigned to Garcia in retaliation for reporting weaknesses in the financial tie out system sufficient to create a genuine issue for trial.

------------------------------------------------------------

[26]  Thomas asserts in response to the Motion for Summary Judgment, in her "Summary of Argument," that her immediate supervisors "disclosed her internal complaints in order to sow discontent amongst her co-workers."  DE 67 at 1.  This particular allegation is not mentioned again in her response brief, and therefore is completely unsupported and is insufficient to create a genuine issue of material fact.

Under these circumstances, the Court concludes that the record does not present sufficient evidence to create a question of fact on causation.  Moreover, the close temporal proximity of HR discovering Thomas's unauthorized investigation and her termination (seven days and two days)[27] support Tyco's reasons for terminating Thomas.  *Chunxue Wang v. Fla. Atlantic Univ. Bd. of Trustees*, No. 16-CIV-80915-MARRA, 2018 WL 3241359, at *13 (S.D. Fla. 2018).  Accordingly, Thomas's complaint for whistleblower retaliation fails as a matter of law.  She has not established that the decision makers had knowledge of her protected activity, and she has not established that she suffered an unfavorable personnel action other than termination, which, as discussed at length above, was done for legitimate nonretaliatory reasons.  *Singleton v. Public Health Trust of Miami-Dade County*, 725 F.App'x 736, 738 (11th Cir. 2018).

**Dodd-Frank Wall Street Reform and Consumer Protection Act**

To state a whistleblower retaliation claim under the Dodd-Frank Act, 15 U.S.C. § 78u-6, a plaintiff must show that: "(1) plaintiff engaged in a protected activity, (2) plaintiff suffered a materially adverse employment action, and (3) the adverse action was causally connected to the protected activity."  *Hall v. Teva Pharmaceutical USA, Inc.*, 214 F. Supp. 3d 1281, 1289 (S.D. Fla. 2016) ("*Hall*") citing 76 Fed. Reg. at 34304

---

[27]  HR was informed that Thomas had contacted the Colombian universities listed on Garcia's resume, via telephone and email between May 7 and 12, 2014.  *See, supra* ¶¶ 40-42.  Thomas was fired on May 14, 2014.

n.41.[28]  Tyco moves for summary judgment as to Thomas's claim under the

Dodd-Frank Act asserting her "conclusory allegations are insufficient to state a claim

because: (1) her reports are not protected activity and (2) there is no causal relation

between her termination and the alleged reports."  DE 64 at 13.

The Dodd-Frank Act protects whistleblowers, defined as "any individual who

provides ... information relating to a violation of the securities laws to the

Commission, in a manner established, by rule or regulation, by the Commission." 15

U.S.C. § 78u-6(a)(6).  Once an individual meets the Act's definition of a

whistleblower, she is entitled to the Act's protections.  Specifically, the Act provides:

> [n]o employer may discharge, demote, suspend, threaten, harass,
> directly or indirectly, or in any other manner discriminate against,
> a whistleblower in the terms and conditions of employment because of
> any lawful act done by the whistleblower—(i) in providing information to
> the Commission in accordance with this section; (ii) in initiating,
> testifying in, or assisting in any investigation or judicial or
> administrative action of the Commission based upon or related to such
> information; or (iii) in making disclosures that are required or protected
> under the Sarbanes-Oxley Act of 2002, ... this chapter, ... and any other
> law, rule, or regulation subject to the jurisdiction of the Commission.

15 U.S.C. § 78u-6(h)(1)(A).  Congress left it up to the SEC to establish the manner in

which a whistleblower can provide information to the Commission—though the

---

[28]  The Eleventh Circuit has not yet addressed the elements of a Dodd-Frank retaliation claim, but this standard is consistent with the elements the Eleventh Circuit has established for other whistleblower retaliation statutes.  *See, e.g., Kearns v. Farmer Acquisition Co.*, 157 So. 3d 458, 462 (Fla. Dist. Ct. App. 2015) (Florida whistleblower claim).  In *Hall*, this Court concluded that Dodd-Frank whistleblower cases will be analyzed the same as retaliation claims under the Florida Whistleblower Act, applying same McDonnell Douglas analysis.

manner it chooses must be consistent with the Act itself.  *See Digital Realty Trust, Inc. v. Somers*, 138 S. Ct. 767, 777 (2018) ("*Digital Realty*") (holding that to be a whistleblower, one must report information to the Commission).

The pertinent regulations provide: "[t]o be considered a whistleblower under Section 21F of the Exchange Act (15 U.S.C. 78u-6(h), you must submit your information about a possible securities law violation by either of these methods: (1) Online, through the Commission's Web site located at http://www.sec.gov; or (2) By mailing or faxing a Form TCR (Tip, Complaint or Referral) ... to the SEC Office of the Whistleblower." 17 C.F.R. § 240.21F-9(a).  In *Digital Realty*, the Court indicated that these are currently the only SEC-established methods.  138 S.Ct at 781.

Thomas did report various potential securities violations about Tyco's workflow deficiencies directly online to the SEC before her termination.  Specifically, she had numerous e-mail exchanges with Craig Phillips, an accountant at the SEC's Division of Enforcement, Office of Market Intelligence, beginning on March 28, 2014.  *See* DE 89, Ex. A.  Accordingly, Thomas made disclosures protected under the Dodd-Frank Act, and Tyco's argument to the contrary is rejected.

Next, Tyco asserts there is no causal connection between any reporting and Thomas's termination.[29]  The Court agrees.  As discussed at length above, there is no evidence to raise a genuine issue of material fact as to whether Thomas's termination

---

[29]  *See, supra* note 20.

was causally linked to her only protected activity, reporting weaknesses in Tyco's tie-out process.  *See*, ¶ 36.  The reason for Thomas's termination is evidenced and documented, and the underlying misconduct regarding Thomas's unauthorized and independent investigation into Garcia's credentials is undisputed.   Accordingly, Thomas has not presented a facie case under the Dodd-Frank Act because she has not shown that her termination was causally linked to statutorily protected activity.

## Florida Whistle-blower's Act

Florida's Whistle-blower's Act ("FWA") is an exception to Florida's at-will employment doctrine.  *Aery v. Wallace Lincoln-Mercury, LLC*, 118 So. 3d 904, 913 (Fla. Dist. Ct. App. 2013).  Under existing precedent, in order to establish a prima facie case of retaliation under the FWA, Thomas must prove that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse employment action was causally linked to the statutorily protected activity.  *See Sierminski v. Transouth Fin. Corp.*, 216 F.3d 945, 950 (11th Cir. 2000) (citing *Olmsted v. Taco Bell*, 141 F.3d 1457, 1460 (11th Cir. 1998)); *Rice-Lamar v. City of Ft. Lauderdale*, 853 So.2d 1125, 1132 (Fla. Dist. Ct. App. 2003) (applying the Title VII burden shifting analysis to a claim brought under Florida's public Whistle-Blower Act); *Taylor v. Memorial Health Systems, Inc.*, 770 So.2d 752, 754 (Fla. Dist. Ct. App. 2000) (putting forth the elements required for a claim brought under Fla. Stat. § 448.102(1)); *Golf Channel v. Jenkins*, 752 So.2d 561, 568 (Fla. 2000) (finding the written notice requirement inapplicable to claims brought pursuant to Fla. Stat.

§ 448.102(2) and (3)).  Only upon such showing does the burden shift to the defendant to put forth a legitimate reason for the adverse employment action.  *Sierminski*, 216 F.3d at 950.

Section 448.102(3), Florida Statutes, provides that an employer may not take any retaliatory action against an employee because the employee has "objected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation."

There appears to be a split of authority as to whether § 448.102(3) requires a plaintiff to allege an actual violation of law, as opposed to a reasonable, good faith belief that a violation of law has occurred.  Florida's Fourth District Court of Appeal found that the FWA does not require plaintiff to prove that she refused to engage in an actual violation of a law, rule, or regulation, but only that she had a good faith, objectively reasonable belief that her activity is protected by the statute.  *Aery*, 118 So. 3d at 916 (quoting *Luna v. Walgreen Co.,* 575 F. Supp. 2d 1326, 1343 (S.D. Fla. 2008)).  On the other hand, Florida's Second District Court of Appeal and other federal district courts have found that a plaintiff must have "objected to an actual violation of law or ... refused to participate in activity that would have been an actual violation of law."  *Kearns v. Farmer Acquisition Co.*, 157 So. 3d 458, 465 (Fla. Dist. Ct. App. 2015); *see, e.g., Meyer v. Health Mgmt. Assocs., Inc.*, 841 F. Supp. 2d 1262, 1268 (S.D. Fla. 2012); *Smith v. Psychiatric Solutions, Inc.,* No. 08-0003, 2009 WL 903624, at *7 (N.D. Fla. Mar. 31, 2009); *White v. Purdue Pharma, Inc.*, 369 F. Supp. 2d

1335, 1336 (M.D. Fla. 2005).  One Court has found that *Kearns* disagreement with

*Aery* is merely dicta and does not affect the status of the law as dictated by *Aery*.

*See Canalejo v. ADG, LLC*, No. 8:14-CV-17-T-MAP, 2015 WL 4992000, at *2 (M.D. Fla.

Aug. 19, 2015); *Evey v. Creative Door & Millwork, LLC*, 2016 WL 1321597, at *4 (M.D.

Fla. 2016).

In either case, and as discussed at length above, there is no evidence to raise a

genuine issue of material fact as to whether Thomas's termination was causally linked

to her only protected activity, complaints about the weaknesses in Tyco's tie-out

process (which never resulted in a false audit).  *See*, ¶ 36.  The reason for Thomas's

termination is evidenced and documented, and the underlying misconduct regarding

Thomas's unauthorized and independent investigation into Garcia's credentials is

undisputed.   Accordingly, Thomas has not presented a prima facie FWA claim

because she has not shown that her termination was causally linked to the statutorily

protected activity.

## Conclusion

Therefore, based on the conclusions reached above, it is hereby

**ORDERED AND ADJUDGED** that Defendant's Motion for Final Summary

Judgment [DE 64] is granted.  In accordance with Fed. R. Civ. P. 58, final judgment

will be entered by separate order.

   **DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County,

Florida, this 19th day of September, 2019.

                                   _____
                                   KENNETH A. MARRA
                                   United States District Judge